EDWARD R. SECCOMB & another *vs.* PROVINCIAL INSURANCE COMPANY.

A policy of insurance on a vessel from New York to ports in South America and thence to ports of discharge in the United States, with an indorsement thereon of " liberty to deviate by going to port or ports in Europe, by paying an equitable premium therefor," covers one round voyage, but does not include a distinct and independent voyage, having no connection with the general objects and purposes of the voyage insured; and in an action upon such a policy evidence is inadmissible to show a usage among commercial men and underwriters which permitted the making of intermediate voyages between the ports of Europe, under the protection of such deviation clause; or a usage, upon which policies have been issued and paid, and which gave to the language of such deviation clause a peculiar and technical sense, namely, the signification of the liberty to make such intermediate voyages; or a usage of trade and commerce by which American vessels at Constantinople, seeking return cargo from Smyrna or other Mediterranean port, in the interval between the discharge of the outward cargo and the season for obtaining cargo therefrom, make intermediate voyages; or to control the legal meaning of such deviation clause by proof of conversation, at the time it was written, between the underwriters and the assured.

CONTRACT on two policies of insurance, by which the defendants insured the plaintiffs' bark Nautilus from New York to Buenos Ayres and Monte Video, one or both, and thence to ports of discharge in the United States. The first policy gave

"liberty of other port or ports, adding one quarter per cent. for each port used after the first used of the above two ports." The second policy gave "liberty of intermediate ports, by adding one quarter of one per cent. for each port used." Upon each policy the following indorsement was added: "Liberty is given to deviate by going to port or ports in Europe, by paying an equitable premium therefor."

At the trial in the superior court, before *Lord*, J., after the decision reported in 4 Allen, 152, it appeared by the deposition of the master, Captain Paine, that the vessel sailed from New York on the 29th of July 1854 for South America; that from Buenos Ayres he went to Rio Janeiro, seeking business, where he chartered her to load coffee for Malta and Constantinople, and sailed for Malta about the 9th of January 1855; that he discharged part of his cargo at Malta, and then proceeded to Constantinople, where he arrived about the 14th of April, and finished discharging his cargo about the 9th of May; that business was very dull there, and nothing was done of any consequence except transport business for the French government; that he obtained a charter from the French government to run between Constantinople and the Crimea, under which one trip was made to Kameish, in the Crimea, and the vessel returned to Constantinople about the 1st of August, and sailed thence for Smyrna, seeking business, about the 2d of August, where she took in a cargo for Boston, and sailed upon the voyage on the 9th of September 1855, and was lost off the American coast.

Edward R. Seccomb, one of the plaintiffs, testified that upon receipt of a letter from the master, on the 26th of February 1855, he went with the letter to the office of the defendants, and the indorsements upon the policies were then made.

The plaintiffs then offered to show the following facts:

1. That the witness read extracts from Captain Paine's letter to the defendants' agent, Captain Williams, and stated to Captain Williams that the vessel was going to Constantinople, and after her arrival would be seeking business, and would return to the United States by way of Smyrna or Leghorn; and that thereupon Captain Williams said, "Ports in Europe would

cover," and directed the indorsements to be made in the present form.

The plaintiffs offered this evidence to show that the defendants knew the existence of the usage as to the meaning of the deviation clause hereinafter stated, and for all other competent purposes.

2. That on the 26th day of February 1855 the Nautilus was bound from Rio Janeiro to Constantinople, and would, on discharge of her cargo, be seeking business there; and that these facts were known to the defendants.

3. That when, upon a policy covering a voyage from the United States to port or ports in one quarter of the globe — say South America — and back to the United States, with a fixed premium for each port, there is indorsed, while the vessel is upon her voyage, a clause giving the vessel liberty to deviate by going to port or ports in another quarter of the globe — say Europe — by paying an equitable premium therefor, there is an established usage among commercial men, underwriters and other persons engaged in the business of insurance, which permits, under such deviation clause, the making of intermediate voyages between the ports of the quarter of the globe — say Europe — to which such deviation clause relates; that such usage existed when the indorsements upon the policies in suit were made, and that premiums were always paid and losses adjusted upon such policies, in conformity to such usage; the premiums in such cases being adjusted and paid at the return of the vessel to Boston or port of discharge in the United States, and being charged for every port visited, according to the risk incurred.

4. That there was, at the time of the indorsements upon the policies in suit, a well known and established usage among commercial men, underwriters and other persons engaged in the business of insurance in Boston, which gave to what is known as the deviation clause, to wit, " Liberty is given to deviate by going to port or ports in Europe, by paying an equitable premium therefor," a peculiar and technical sense, to wit, the signification of liberty to make intermediate or independent voyages in Europe ; and that upon such technical sense and signification of

the clause, policies have been uniformly issued, premiums paid and losses adjusted.

5. That by the usage of trade and commerce American vessels at Constantinople, seeking return cargo from **Smyrna** or other port of the Mediterranean, in the interval between the discharge of the outward cargo and the season for obtaining cargo from Smyrna or other Mediterranean port, make intermediate voyages.

These offers were rejected by the judge, who ruled that so much of the evidence offered as is competent does not show that the bark was protected on the intermediate voyage from Constantinople to the Crimea, and that she was protected at the time of the loss.

A verdict was thereupon taken by consent for the defendants, and the plaintiffs alleged exceptions.

*B. F. Thomas & G. F. Homer*, for the plaintiffs. The voyage to Kameish and back was within the policies. There is nothing on the face of them which limits the number of voyages. The added clauses allow not merely one deviation, but a series of deviations. The offers to show that this voyage was within the policy, because by an established usage among commercial men and underwriters it was permitted, should not have been excluded. In all commercial cases, the course of the voyage, the customs of trade and of insurance, and commercial usages, when reasonable and established, make part of the contract. The evidence was admissible upon the authority of many cases, and of the writers on marine insurance. *Salvador* v. *Hopkins*, 3 Burr. 1707. *Eyre* v. *Marine Ins. Co.* 5 Watts & S. 116. *Bulkley* v. *Protection Ins. Co.* 2 Paine C. C. 82. *Macy* v. *Whaling Ins. Co.* 9 Met. 354. *Moxon* v. *Atkins*, 3 Camp. 200. *Noble* v. *Kennoway*, 2 Doug. 510. *Child* v. *Sun Mutual Ins. Co.* 3 Sandf. R. 26. *Clark* v. *Baker*, 11 Met. 186. *Vallance* v. *Dewar*, 1 Camp. 503. 1 Phil. Ins. §§ 144, 981, 1003. 1 Marsh. Ins. 178. 1 Duer on Ins. 195, 196. 1 Park on Ins. 30. 1 Arnould on Ins. 43, 355. Hughes on Ins. 128, 130. 3 Kent Com. (6th ed.) 282, 309, 313. 2 Parsons Mar. Law, 56. The case of *Lowry* v. *Russell*, 8 Pick. 360, fully sustains the doctrine contended for. The

**offer** to show the peculiar and technical sense attached to the deviation clause was admissible. The phrase used had acquired a peculiar and technical meaning, to which the law has given no interpretation. It is familiar law that in such cases evidence is received of such meaning. See *Eaton* v. *Smith*, 20 Pick. 150 · *Dow* v. *Whetten*, 8 Wend. 160; *Houghton* v. *Gilbart*, 7 C. & P. 701; *Peisch* v. *Dickson*, 1 Mason, 9; *Coit* v. *Commercial Ins. Co.* 7 Johns. 385; *Astor* v. *Union Ins. Co.* 7 Cow. 202; *Fowler* v. *Ætna Ins. Co.* 7 Wend. 270; *Daniels* v. *Hudson River Ins. Co.* 12 Cush. 416, 429; *Brown* v. *Brown*, 8 Met. 576; *Wilkinson* v. *Greely*, 1 Curtis C. C. 63; *Two Hundred Chests of Tea*, 9 Wheat. 430, 438; *Barlow* v. *United States*, 7 Pet. 404, 409; *United States* v. *Casks of Sugar*, 8 Pet 277; 1 Smith's Lead. Cas. (5th Amer. ed.) 677; 1 Arnould on Ins. 63. In these cases, the evidence does not add to nor qualify the written contract; it only ascertains it by expounding the language. *Brown* v. *Byrne*, 3 El. & Bl. 703. *Cuthbert* v. *Cumming*, 10 Exch. 809; *S. C.* 11 Exch. 405. *Eaton* v. *Smith*, 20 Pick. 150, 156. *Hutchison* v. *Bowker*, 5 M. & W. 535. *Lethulier's case*, 2 Salk. 443. *Urquhart* v. *Barnard*, 1 Taunt. 450. *Crocker* v. *Mut. Ins. Co.* 8 Cush. 79. *Macy* v. *Whaling Ins. Co.* 9 Met. 354.

The proposed evidence that these usages were established, uniform and notorious, was in accordance with well settled principles. See 1 Greenl. Ev. §§ 277, 292; 1 Phil. Ins. §§ 138–144; *Smith* v. *Thompson*, 8 C. B. 44; *Clark* v. *Baker*, 11 Met. 186; *Winsor* v. *Dillaway*, 4 Met. 221. *Macy* v. *Whaling Ins. Co.* 9 Met. 354. The usages were reasonable. They tend to facilitate commerce, and are equally favorable to both parties. In a voyage policy, a deviation discharges the insurers. But by the usages now under discussion, the insurers permit voyages not defined, and receive their consideration. This is not unreasonable. The objection that the contract is interminable or indefinite would apply equally to other cases where similar policies have been sustained. *Thorndike* v. *Bordman*, 4 Pick. 471. *Eyre* v. *Marine Ins. Co.* 5 Watts & S. 116. *Grant* v. *Paxton*, 1 Taunt. 463. *Armet* v. *Innes*, 4 Moore, 150. *Hunter* v. *Leathley*, 10 B. & C. 858. Emerigon on Ins. 556. The contract was made for

the usual and ordinary course of trade and mercantile business and not for extreme, improbable and extraordinary cases.

The first and second offers of evidence were also competent.

*R. H. Dana, Jr. & C. W. Loring,* for the defendants, cited, upon the admissibility of the usages, *Dickinson* v. *Gay,* 7 Allen, 29, and cases cited; *Hone* v. *Mut. Safety Ins. Co.* 1 Sandf. R. 137; *Rogers* v. *Mechanics' Ins. Co.* 1 Story R. 603, 607; *Blackett* v. *Royal Exch. Co.* 2 Crompt. & J. 244; *Crofts* v. *Marshall,* 7 C. & P. 597, 607; *Blazier* v. *Clap,* 5 Mass. 1; *Middlewood* v. *Blakes,* 7 T. R. 162; *Eliot* v. *Wilson,* 4 Bro. P. C. 470; *Taunton Copper Co.* v. *Merchants' Ins. Co.* 22 Pick. 108; *Hurst* v. *Usborne,* 18 C. B. 144.

BIGELOW, C. J. If the policies declared on in this case are to be interpreted solely by the legal import and construction of the language used by the parties to express their meaning, without a resort to extrinsic evidence, there is no room for doubt as to the nature and extent of the risk which the defendants assumed. The original contract was for insurance on a voyage from New York to Buenos Ayres and Monte Video, one or both, and thence to a port of discharge in the United States, with liberty of other port or ports, adding an additional premium for each port visited after the vessel had been to either one of the two first named. By the well settled rule of construction, this phraseology aptly describes a round voyage from New York to Buenos Ayres and Monte Video and back again to a port of discharge in the United States, with the right to go to other ports between the *termini* named, in furtherance of the purposes of the outward or homeward voyage, and in prosecution of the real objects of the adventure originally contemplated by the parties.

The same rule of construction is applicable to the clause indorsed on the policies by which the original voyage was varied and changed by giving to the assured "liberty to deviate by going to port or ports in Europe, by paying an equitable premium therefor." Giving to this language the natural force and effect of the words used, unaided by extrinsic proof, the risk was still for a round voyage, but, instead of being limited to ports in South America and thence to a port of discharge in the United

States, it was extended so as to embrace in the voyage insured a right to visit one or more ports in Europe. But this right, or " liberty," as it is termed in the policies, was to be taken and enjoyed in subordination to the principle that the port or ports which the assured might visit should be only those which were properly in the course of the voyage described, and in pursuance of the general purposes of the adventure or enterprise embraced within the *termini* designated in the policies. Certainly it is inconsistent with any fair and reasonable interpretation of tne clauses in question to hold that they embrace, *ex vi termini,* a right to make distinct, separate and independent voyages, having no connection with the general objects and purposes of the voyage, either outward or homeward, named in the policies, but undertaken as new and intermediate voyages, having no reference to the accomplishment of the ultimate destination of the vessel or her port of discharge. Such an interpretation woulc convert a voyage policy, limited in the extent and duration of the risk insured to a particular adventure or enterprise, into a contract of insurance for an unlimited period of time, and upon risks the nature and extent of which neither of the parties to the contract could know or foresee. The only safe rule of construction is that which confines the meaning of a clause in a voyage policy giving liberty to touch at different ports to a permission to visit those only which are within the scope of the voyage insured. 1 Arnould on Ins. 369–380. 1 Phil. Ins. § 1007. *Stocker* v. *Harris,* 3 Mass. 409. *Bottomley* v. *Bovill,* 5 B. & C. 210; *S. C.* 7 D. & R. 702. *Solly* v. *Whitmore,* 5 B. & Ald. 45. *Kettell* v. *Wiggin,* 13 Mass. 68.

Nor do we think that this well settled rule of interpretation, in its application to this clause in the policies, is at all affected by the stipulation that an equitable premium is to be paid by the assured for the ports visited. This does not enlarge the risk or change the description of the voyage insured. It confers no right to visit additional ports not necessary or proper to promote the general purposes of the adventure or enterprise which is designated by the *termini* of the voyage named in the policies. It is inserted for a different purpose. Inasmuch as the port or ports

which may come within the scope of the voyage are necessarily uncertain, being dependent on the exigencies which may arise in the prosecution of the original enterprise, and as the risks to be incurred cannot therefore be accurately estimated beforehand so as to enable the parties to stipulate for an adequate premium in anticipation, the purpose of this clause is to leave the premium to be adjusted after the course of the voyage has become known, so that it may be regulated according to the risk actually incurred. This interpretation fully satisfies the language of the stipulation, without introducing any element of uncertainty into the nature or extent of the risk assumed. It is the premium only which is uncertain. The risk is limited by the scope and purposes of the voyage described in the policies. It is a mistake, therefore, to say that the clause in question gives general liberty to go anywhere in Europe, at the pleasure of the assured, on paying an equitable premium. Such might be the interpretation if the policies contained no words descriptive of any particular voyage, but were in terms only to port or ports in Europe. But these words are to be taken in connection with and as part of the other clauses in the policies, which describe the risk assumed by the defendants, as a voyage commencing in the United States and ending by the return of the vessel to her port of discharge in this country.

The plaintiffs, feeling the force of this view of the interpretation of the policies, seek to escape its effect by evidence of mercantile usages by which they propose to vary and control the written words, and to give to them a different meaning from that which results from their natural import, as expounded and established by the general current of judicial decisions. It is an admitted fact that the vessel insured, after leaving Rio Janeiro whither she had gone in prosecution of the voyage, seeking business, sailed thence, bound for Constantinople with a cargo of coffee, at which port she arrived and discharged her cargo. In consequence of the dulness of trade and the inability of the master to obtain immediate and profitable employment of the vessel in the regular course of the voyage towards her final destination at a port of discharge in the United States, he

entered into a charter party with the French government, under which he made a voyage to Kameish, in the Crimea, and back again to Constantinople. This was a distinct and independent voyage, having no connection with the accomplishment of the original voyage described in the policies, and not being undertaken in furtherance of the ultimate object of reaching the port of discharge in the United States. By the rule of construction already stated, this intermediate voyage was a deviation, and avoided the policies, unless the plaintiffs can be permitted to prove the usages alleged by them to exist, and by which such independent voyages are deemed to be embraced within the description of the adventure or enterprise originally contemplated by the parties, as set forth in the written words in the policies and the indorsements thereon.

There can be no doubt that, in the interpretation of written contracts, especially those of a mercantile character, evidence of usage is competent and frequently admitted, to explain the sense in which particular words or phrases are used, and to show that, as applied to the subject matter, the language of the instruments was understood by the parties to have a special and peculiar meaning, differing from that which might ordinarily be attributed to it. Especially is this true in respect to policies of insurance. These contracts, like others of a mercantile nature, when first introduced as subjects of exposition in the courts of common law, contained many loose, undefined and indeterminate words and phrases, which, if interpreted literally, and without reference to the course of trade and the customs of merchants, would have increased the risk assumed by the insurers or abridged the indemnity secured to the assured, contrary to the real intentions of the parties. But it is obvious that the necessity which gave rise to the liberal rules which have heretofore been adopted by courts of justice in admitting usages as explanatory of this class of customs has in great measure ceased to exist. By a long course of judicial decisions, that which was originally indefinite and uncertain and difficult of application in the language of the instrument has become clear, determinate, and well settled. The consequence is, that of late years, the

tendency of courts of law has been to apply the rules regulating the competency of usages to explain and interpret the language of written instruments with great strictness, and to guard with increased vigilance against the danger of allowing extrinsic evidence to vary or control the words in which the parties have deliberately expressed their meaning. Many of the early authorities in England and in this country go much farther in the admission of testimony to prove usages for the purpose of aiding in the interpretation of written contracts than would be deemed to be reasonable or safe at the present day. We are inclined to doubt whether in any case it would now be deemed to be competent to offer evidence to show that a description of a voyage in a policy which is susceptible of a clear and definite exposition in conformity to the interpretation of the words as established by adjudicated cases has another and different meaning by mercantile usage from that which has been so recognized and settled.

But we have no occasion in the present case to express a decided opinion on so broad a proposition. On careful consideration, it seems to us that the usages set up by the plaintiffs are wanting in an essential element, without which they can have no validity. One of the cardinal rules by which the recognition and application of usages in courts of law is governed is, that they must be reasonable ; that is, such that, if incorporated into the contract, and as applied to the subject matter, they would be just and appropriate stipulations, and not calculated to throw heavy and disproportionate burdens upon either party. A mercantile usage, in order to be received as explanatory or in aid of the exposition of a policy of insurance, must not on the one hand tend to increase excessively or indefinitely the risk assumed by the insurers, nor on the other hand unreasonably to deprive the assured of the indemnity which the words of the contract, fairly interpreted, would secure to him. If a usage leads to consequences which are absurd or which could not be fairly presumed to have been contemplated by the parties, the presumption is repelled, which the law might otherwise make, that it was intended to be adopted as part of the contract. Therefore courts

of law will not enforce unreasonable or absurd usages, however uniform and well known. Parties in framing their contracts have a right to disregard them, and cannot be held to have entered into written stipulations with any reference to them.

Examined in the light of these familiar principles, it seems to us that the usages on which the plaintiffs mainly relied to avoid the effect of the alleged deviations cannot be supported. In the first place, these usages, if adopted, would enlarge the voyage insured, as described in the policies, and which the parties actually had in view when the insurance was effected, to an unreasonable extent, and would thereby increase the risk cast upon the underwriters beyond that which could have been contemplated when the contract was entered into. The real adventure or enterprise which the parties intended to insure at the time the liberty to go to port or ports in Europe was indorsed on the policies, as appears by the deposition of the master and the testimony of one of the plaintiffs, was what is usually called a Mediterranean voyage — that is, a voyage to Malta and Constantinople, and thence to other ports in the Mediterranean, in order to obtain a return cargo to a port of discharge in the United States. This was the voyage comprehended within the description in the written contract. Taking this description by itself, it is obvious that the risks attendant upon such an adventure could be readily anticipated by the insurers. They knew the seas which the vessel was about to visit, and the perils of navigation to which she was likely to be exposed. They therefore had the means of estimating without difficulty, at the inception of the risk, the nature, extent and probable duration of the voyage — essential elements necessary to enable them to form a judgment of the risks which they were about to assume. But these would be wholly wanting, if the usages relied upon by the plaintiffs are competent and admissible to vary and control the language of the policies. Not only would the insurers be ignorant of the probable course of the vessel, but they would be able to ascertain nothing concerning the risks which might be cast upon them during the time the policies remained in force. If the right to make intermediate voyages, separate and distinct from the main

voyage described in the policies, can be engrafted on the contract the destination of the vessel and the risks to which she may be exposed are necessarily left in uncertainty. They must depend in great measure on the course of trade, the fluctuations of markets, and other causes affecting the interests of the insured. Indeed, the effect of the usages in question as applied to the subject matter would be to give to one party to a contract the right to determine the extent of the obligation or duty which was to be borne by the other. It would be left solely to the insured to decide whether the terms of the contract should be extended and the risks increased by adding new, distinct and independent voyages, not embraced within the terms of the written agreement of the parties. It would be in his power to vary the risks indefinitely, according as the exigencies of commerce and his own interest might prompt him to seek new employment for the vessel. Thus it might happen that a vessel originally insured on a voyage to a portion of a quarter of the globe lying within the lower latitudes, where the seas were not tempestuous, and to ports there situated, in visiting which the vessel would be exposed to few and inconsiderable perils, might be sent by the assured, without the knowledge or assent of the underwriters, on new and distinct voyages to higher latitudes and stormy seas, where the navigation would be difficult and dangerous, and the perils to be encountered would be not only different, but much greater than those incident to the original voyage described in the policy. The case at bar itself furnishes a good illustration of the extent to which the written words might be enlarged, and the liability of the insurers increased, if evidence of such usages as those relied on by the plaintiffs is competent to add to the written words of the contract. It would then follow that the plaintiffs might have sent their vessel under the protection of the policies, not only to ports in the Mediterranean and in adjacent seas, but to ports in the North Sea and the Baltic, or even into the Arctic Ocean. Usages which might operate so entirely to change and extend the risk which the parties had in view and which formed the subject matter of the contract at its inception cannot be regarded as being such that they should receive the sanction of a

court of law as just and reasonable in their effect on the rights of parties.

But there is another and equally serious objection to the recognition of the usages in question. They do not merely allow the assured to vary the voyage and to change and increase the risk by extending it to a single new adventure or to a series of additional voyages of limited duration, but they engraft on a policy which describes a single round voyage, capable of being completed in the usual course of navigation within a period of a few months, the right to go upon any number of distinct and intermediate voyages which the assured may deem it expedient or profitable to make, and thus to extend the contract of insurance indefinitely, so as to cover voyages during any number of years, and thus to render the contract terminable only at the will of the assured. A usage which may lead to such an absurd consequence is one which of itself repels the presumption that the parties entered into the contract with reference to it. However uniform and notorious it may have been, the insurers had a right to disregard it, as imposing on them a burden disproportionate and unreasonable, and which they could not be compelled to take upon themselves by force of legal implication only.

Upon examining the cases which have been cited by the counsel for the plaintiffs, as most analogous to the case at bar, in which extrinsic evidence has been admitted to vary the description of a voyage, as set out in the policy, we do not find that any of them go to the extent of upholding usages such as are relied on to justify the deviation in the present case. The leading decisions are those which were made in relation to insurances on ships engaged in voyages to the East Indies, under charters to the East India Company. The first are *Salvador* v. *Hopkins*, and *Heaton* v. *Rucker*, 3 Burr. 1707. In these cases, evidence of a usage to make intermediate voyages, commonly called "country voyages," between ports in the East Indies and China, after the arrival of the ship in India, was admitted to explain the description of the voyage in the policy. But the usage in these cases was limited to voyages to ports situated in the same countries with those specified in the policies, and

within the same degrees of latitude, and the additional risks thrown upon the insurers were similar in kind and degree with those specified in the policies. Nor were the intermediate voyages indefinite in number or duration, so as to allow the assured to extend the policy for an unlimited time. The usage was expressly confined to the detention of the ship beyond the voyage named in the policy for one year only. It may be also added that these cases did not turn on evidence of usage only. There were many additional facts and reasons to support the decision, especially the very broad language used in the policies to describe the voyage insured, and the fact that the underwriters waived all objection by acquiescence in the intermediate voyage, which was known to them before the insurance on the vessel was effected, so that they were shut off from setting up as a defence that they were not expressly told at the time of underwriting that a new and intermediate voyage was to be performed. The cases of *Gregory* v. *Christie* and *Farquharson* v. *Hunter*, reported in Park on Ins. 83, 84, seem to have in part turned on the same usage in relation to voyages under charters to the East India Company as that referred to in the cases just cited. The report of the cases is meagre and imperfect; but it appears that the usage set up was limited to intermediate voyages in the same seas as those named in the policy, and did not extend so as to include voyages which would continue beyond the period of a year from the time when the voyage named in the policy would have terminated. The case of *Noble* v. *Kennoway*, 2 Doug. 510, arose on a policy of insurance on ships with cargoes bound on fishing voyages to Labrador, with liberty to touch at Newfoundland. The usage deemed to be admissible in this case was only to delay the discharge of a part of the outward cargo during a few months, while the vessels were engaged in catching fish; a usage which did not indefinitely prolong the risk assumed by the insurers of the cargo. So in *Vallance* v. *Dewar*, 1 Camp. 503, the usage was limited to the time usually occupied by vessels in fishing on the banks near the coast of Newfoundland — a period of only a few months. In *Eyre* v. *Marine Ins. Co.* 5 Watts & S. 116, the usage was not

that the insurance would continue for an unlimited time, but merely until the termination of the voyage on which the vessel might happen to be engaged when the policy by its terms would have expired.    In all these cases the usages which were the sub- ject of judicial consideration did not authorize the assured to enter upon new and intermediate voyages to places far distant from the course of the voyage or from the ports named in the policy, nor to prolong the risk of the insurers indefinitely, and to render it terminable only at the pleasure of the assured.    We have found no case which recognizes the validity of such a usage. On the contrary, in *Ougier* v. *Jennings*, 1 Camp. 505, *n.*, Lord Eldon instructed the jury that if evidence of a usage " leads to this, that the ship may make an intermediate voyage of several years, it is too dangerous for you to give it effect."

No doubt there are cases in the books where policies have been sustained and enforced by courts of law in which the risks assumed by the underwriters have been expressed in such terms that a just interpretation of the language has cast on the under- writers a very broad and unlimited liability.    Some cases of this nature are cited by the learned counsel for the plaintiffs.    But they do not seem to us to have any bearing on the questions in contention here.    The plaintiffs do not ask us to interpret the language which the parties have used, but to engraft on the con- tract, by extrinsic evidence, stipulations which the parties have not in terms entered into, but which it is said the law annexes to their contract.    If parties have put their agreements in clear and explicit language, it is the duty of courts to enforce them, although they may lead to unreasonable and absurd results. But it is otherwise when stipulations are to be added or inci- dents annexed to contracts by implication arising from mercan- tile usages.    Unless these usages can be supported as being just and reasonable, then they are to be rejected, however well estab- lished and clearly proved.

It is urged that the clause in the policies which provides that the assured are to pay an equitable premium for the port or ports in Europe which the vessel may visit secures to the in- surers a full consideration for any risk to which they may be

subjected in the course of the employment of the vessel, and that in connection with this clause the usages relied upon cannot be regarded as unreasonable, because an adequate premium must be paid for each intermediate voyage which the owner or master may perform, until the return of the vessel into the United States. But this suggestion does not meet the difficulty. The objection to the usages is not that the insurers may not obtain a compensation for the additional risks to which they may be subjected, but that they have no voice or right of election in determining whether they will incur them at all. If the usages are valid, it is the right of the holder of the policy to force on the underwriter without his knowledge or assent any number of intermediate voyages, or to send the vessel to any part of a continent, and thus to extend the policy indefinitely without any right or power in the insurers to terminate it. The anomalous and unreasonable feature of the usage is, that the nature, extent and duration of the risks are left to be determined by the assured, and that the underwriter is compelled to assume them, although, if he had the right of election, he would refuse to bear them at all for any premium, however large. There is no reason for supposing that the clause providing for the payment of an equitable premium for the port or ports which the vessel might visit was inserted with particular reference to the supposed usages. As has been already said, this stipulation was necessary and proper, and could have full operation and effect, if the voyage had been strictly confined to that originally contemplated and described in the language of the policies.

In what has been heretofore said, we have had reference to the two usages which stand first in order in the bill of exceptions. It may be well to add, that these usages contain no limitation of time within which the right of making intermediate voyages is to be exercised, nor of the places to which the vessel may be sent by the assured under cover of the policies, except that the voyages are to be confined to that quarter of the globe to which the vessel had the right to go by virtue of the description of the voyage inserted in the policies. In determining on the validity of these usages, therefore, we have considered them as

existing exactly in conformity to the offers of evidence made at the trial. Whether, if modified and restricted as to time and place, they could be upheld, we have not felt called upon to decide. For aught that we can know, no such modification or restriction could be introduced consistently with the actual practice among merchants. The question which we have to determine is not whether a usage, sufficient to justify the deviation in the voyage insured, is reasonable and valid, but whether usages of a scope and operation so general and unlimited as those alleged at the trial can be supported as legal and binding on the parties to the contract. These were the usages which the plaintiffs allege that the defendants were bound to know, and with reference to which they made the contract declared on. They are therefore to be taken as a whole. The defendants could be required only to consider whether these usages, as they are alleged to exist, were unreasonable and oppressive, and if they were, they had a right to disregard them entirely, and they cannot be deemed to have incorporated them into the policies.

In regard to the usage set forth in the last offer of proof made by the plaintiffs at the trial, it is sufficient to say that it is not alleged to have been adopted or acted upon by parties in entering into contracts of insurance, or that policies have been taken or premiums paid or losses adjusted with reference to it. The offer was only to prove that American vessels at Constantinople, seeking a return cargo from ports in the Mediterranean, in the interval between the discharge of the outward cargo and the season for obtaining a return cargo, make intermediate voyages. But proof of such usage was immaterial, unless it could also be shown that it was acted upon in the business of insurance, and that such intermediate voyages were included in the description of the voyage contained in the policies. A usage to go upon intermediate voyages could avail the plaintiffs nothing, unless they could prove further that vessels were deemed to be protected while performing such voyages, by policies which did not in terms cover them. This the plaintiffs did not offer to show. *Taunton Copper Co.* v. *Merchants' Ins. Co.* 22 Pick. 102, 115 *Dickinson* v. *Gay,* 7 Allen, 29.

The statements of the conversation between one of the plain-tiffs and the defendants' agent at the time the indorsements were made on the policies were rightly excluded. No fraud, misrepresentation or concealment was alleged. The written contract was the sole evidence of the stipulations into which the parties entered. *Exceptions overruled.*